**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

```
CARMEN FIGUEROA-FLORES         *
                               *
     Plaintiff                 *
                               *
v.                             *     Civil No. 06-1939 (SEC)
                               *
HON. ANIBAL ACEVEDO-VILA,      *
et al.                         *
                               *
     Defendants                *
*********************************
```

**OPINION AND ORDER**

Pending before the Court is Carmen Figueroa-Flores's ("Figueroa" or "Plaintiff") Motion for Partial Summary Judgment (Docket # 70). Defendant Marta Rivera-Reyes ("Rivera-Reyes") has not filed an opposition. For the reasons set forth below, Figueroa's Motion for Partial Summary Judgment is **GRANTED.**

**Factual Background**

Figueroa, a sixty year old social worker, filed suit against herein Rivera-Reyes, and several defendants,[1] under Section 1983 of the Civil Rights Act of 1964, 42 U.S.C. § 1983, the Fourth, Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution, Sections 1 & 8 of Article II of the Commonwealth's Constitution, and Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141, seeking indemnization for Defendants' violations of her constitutional rights as a result of an illegal strip and cavity search. According to the complaint, on September 22, 2005, Plaintiff was arrested pursuant to a warrant for civil contempt. She claims that this warrant was sought by Co-defendant Maribel Sánchez-Muñoz ("Sánchez-Muñoz"), a Family Law Special Prosecutor, and illegally issued by Co-defendant

---

[1] Pursuant to this Court's prior Opinion & Order, Plaintiff's claims against Ivelisse Salazar-Napoleoni, Federico Hernández-Denton, and Anibal Acevedo-Vilá, and the official capacity claims against Co-defendants Marta Rivera-Reyes and Maribel Sánchez-Muñoz were dismissed with prejudice. Docket # 25.

**Civil No. 06-1939 (SEC)**                                                                                                          2
_____

Ivelisse Salazar-Napoleoni ("Salazar-Napoleoni"), a Superior Court judge. According to Figueroa, prior to the issuance and execution of the warrant, she was not given an opportunity to contest the propriety of the contempt determination; she was not advised that a civil contempt hearing would be held on September 21, 2005, nor was she served with an order to show cause why the warrant for contempt should not be issued.

Upon Figueroa's arrest in the marshals' office at the Caguas Court, Sánchez-Muñoz instructed Rivera-Reyes, a deputy marshal at the Caguas court, to place Figueroa in a holding cell. Once Figueroa was in the holding cell, Rivera-Reyes ordered her to fully undress. Rivera-Reyes then went on to conduct a strip search and visual cavity inspection of Figueroa. Because the holding cell where the search took place was visible from the marshals' office, several male marshals who were at the office were able to observe the search as it was conducted. Figueroa was not suspect of smuggling contraband or drug-dealing, nor were there any indications that she was a threat to herself or any other person. During the search, Figueroa was nervous, and as a result thereof, she lost control of her bodily functions. She was later taken to the afternoon court session, handcuffed, and still soiled from the search and attendant consequences. There she obtained legal counsel, who successfully argued that the civil contempt order and arrest warrant be vacated. Figueroa argues that, as a result of these events, she suffered emotional distress and mental anguish.

On May 23, 2008, Figueroa filed a motion for partial summary judgment as to Rivera-Reyes' personal liability. Docket # 70. On several occasions, Defendants requested leave to file an opposition, but did not file the same. Dockets ## 71, 76 & 78. Thus, Figueroa's motion is unopposed.

**Standard of Review**

*R. FED. CIV. P. 56*

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005). In reaching such a determination, the Court may not weigh the evidence. Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994). At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)(citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion." Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). "The non-movant

**Civil No. 06-1939 (SEC)** 4

must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. . . . Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

**Applicable Law and Analysis**

In the present motion, Figueroa requests summary judgment exclusively as to Rivera-Reyes' liability. According to Figueroa, Rivera-Reyes admitted all the facts pertaining to the illegal cavity search, in her deposition testimony, and answers to interrogatories. She further argues that, since there are no issues of material facts as to the cavity search itself, this Court should enter judgment as a matter of law. In support of her argument, Figueroa cites ample case law accrediting the illegality of blanket search policies not based on individualized suspicion, and specifically, in cases of arrestees held for minor offenses, unrelated to drugs, violence, or contraband.

Because the instant motion is for summary judgment, the parties must comply with the requirements of Local Rule 56, and file a statement of facts, set forth in numbered paragraphs, and supported by record citations. See Local Rule 56(b). Plaintiff complied with this rule, and submitted a Statement of Uncontested Facts (Docket # 129)(hereinafter "Plaintiff's SUF"), numbered, and supported by record citations. After reviewing Plaintiff's SUF, together with the accompanying evidentiary documentation, this Court finds that the facts proposed by Plaintiff are properly supported by admissible evidence.

In turn, when confronted with a motion for summary judgment, the opposing party

**Civil No. 06-1939 (SEC)**                                                                                                    5

must:

> [s]ubmit with its opposition a separate, short, and concise statement of material facts. The opposition shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule.

Local Rule 56(c). If the opposing party fails to do so, "summary judgment should, if appropriate, be entered." FED. R. CIV. P. 56(e)(2). These rules "are meant to ease the district court's operose task and to prevent parties from unfairly shifting the burdens of litigation to the court." Cabán-Hernández v. Phillip Morris USA, Inc., 486 F.3d 1, 8(1st Cir. 2007). When the parties ignore the Local Rule, they do so at their peril. See Ruiz-Rivera v. Riley, 209 F. 3d 24, 28 (1st Cir. 2000).

In the instant case, Defendants failed to file an opposition. As a result, and per FED. R. CIV. P. 56(e)(2), Plaintiff's motion is deemed unopposed. Thus, the Court will deem as admitted those facts which are supported by the record, and which Defendants failed to deny or qualify. This solution is consistent with Local Rule 56, and First Circuit precedent. See Philip Morris, 486 F.3d at 8. After reviewing the record, this Court finds that the following pertinent facts, are uncontested.

Figueroa is a 61 year old licensed social worker in Puerto Rico. Plaintiff's SUF ¶ 1. As a professional social worker, Figueroa has worked on several cases before the courts of Puerto Rico, and has testified in that capacity. Id. at 2. She has no criminal record, does not own a firearm, and had never been arrested prior to the events which led to this lawsuit. Id. at 3. Figueroa is also the paternal grandmother of the minor child, L.E.V., and has had custody of the child L.E.V. since he was 6 years old, shortly before her own son's death in 1994. Id. at 4 & 8.. On May 1999, Figueroa filed suit in the Puerto Rico Court of First Instance, Humacao Section, (Figueroa-Flores v. González-Pérez, HCU 1999-0030) against L.E.V.'s biological mother, requesting custody and tutorship of L.E.V. Id. at 8. In response to said lawsuit, L.E.V.'s biological mother, Brenda I. González Pérez ("Gonzalez"), accepted

**Civil No. 06-1939 (SEC)** 6

the allegations in the complaint, and agreed to the relief requested. Id. at 9. On November 2000, after the case was transferred to the Caguas Section, Figueroa was granted legal custody of L.E.V., and González was awarded open visitation. Id. at 10.

However, over the next several years, the litigation continued, and became increasingly bitter. Id. at 11. Disputes arose regarding the maternal visits, about the possibility of visits by the maternal grandfather, and about the psychological evaluations and treatments of the minor child. Id. On December 2004, Gonzalez filed a motion requesting a finding of contempt against Figueroa, alleging that she had unduly influenced the boy to reject his visits with his biological mother. Id. at 12. On January 2005, Figueroa's attorney in the above-referenced suit, Víctor Ortiz Lebrón ("Ortíz"), filed an urgent motion filed on her behalf, alleging that the minor was being unduly coerced by a court psychologist, who was urging him to continue visits with his mother. Id. at 13. In the interim, Sánchez-Muñoz, the Family Court Prosecutor, was assigned to the case. Id. at 14. On March 2005, Sánchez-Muñoz, in agreement with the court psychologist, requested that maternal visits be resumed. Id. On April 26, 2005, Sánchez-Muñoz filed a motion requesting that Figueroa be found in contempt, alleging that she had failed to take the minor child to court-ordered therapies. Id. at 15.

Two weeks later, on May 11, 2005, Ortíz moved to withdraw from Figueroa's case. Id. at 16. In his motion to the court, Ortiz requested that Figueroa be granted thirty (30) days to announce her new legal counsel. Id. at 17. On May 20, 2005, the court granted Figueroa until June 9, 2005 to announce her new counsel. Id. She was notified of this order through Ortíz, however, she was not given sufficient time to secure new counsel prior to the hearing, which was scheduled for mid-June of that year. Id. Between May and August 2005, Figueroa unsuccessfully attempted to secure an attorney to represent her in the case. Id. at 18. Finally, in August of 2005, she was able to schedule an appointment with attorney Ana López Prieto ("López"). Id. However, López had to cancel the initial appointment, and informed Figueroa

**Civil No. 06-1939 (SEC)**                                                                                                              7

that she could not meet with her until August 30, 2005. Id.

The Caguas court set a hearing on the request for a contempt for mid-August. Id. at 19. However, neither party showed up for the hearing, and the court rescheduled it for September 1, 2005. Id. While Figueroa was attempting to secure legal counsel in order to continue with her case, she proceeded with the case *pro se*, and submitted several motions to the court. Id. at 20. In one of those motions, she stated that the Family Court Prosecutor, Sánchez-Muñoz was acting as "another attorney for the defendant, instead of defending the minor child," and was making false representations to the court. Id. On August 23, 2005, Figueroa also filed a motion *pro se* before the court, stating that she was in the process of hiring López, and that said attorney would not be able to meet with her for an appointment until August 30, 2005. Id. at 21. In the motion, Figueroa requested that the September 1, 2005 hearing be postponed, and requested an additional thirty (30) days to secure legal representation. Id. After filing said motion, she believed that the hearing date would be postponed, and that the court would set a new hearing date after she secured legal counsel. However, the court did not issue an order regarding this matter, and instead, the hearing was held on September 1, 2005, without Figueroa's presence, and without her knowledge. Id. a23-25.

Subsequently, Figueroa learned that the Judge presiding over the custody and tutorship case issued an Order dated September 21, 2005, requiring her "Arrest and Imprisonment" on civil contempt, until such time as she could "evidence to the court her agreement to comply with the orders" of the court. Id. at 26. At that time, Figueroa was also unaware that a hearing was set for the following day, September 22, 2005. Id. at 27. However, on the morning of September 22, 2005, Figueroa found a document, which had been left on the ground in front of the door at her daughter's house. Id. at 28. The document, dated September 21, 2005, and issued by the Caguas court, instructed plaintiff to "appear on September 22, 2005, at 8:30 AM, at the Office of the Marshal, Citations Unit, which is located on the sixth

**Civil No. 06-1939 (SEC)**                                                                                            8

---

floor of the Caguas Court." The document also stated that she was to pick up an "important" notification. Id.

As a result of the aforementioned, Plaintiff arrived at the courthouse at approximately 8:30 AM. Id. at 29. Upon her arrival, she passed through the entrance to the building, which contains metal detectors. Id. She then went to the sixth floor office, as instructed, after which she was told to go to another office. Id. At 30. There, she encountered another marshal who told her to go to Courtroom #610 (presided over by the Judge handling her custody case), to receive the alleged notification. Id. In Courtroom #610, Figueroa was told to sit down and wait. Id. at 31. After waiting for a while, she asked the courtroom marshal for the document she was instructed to pick up. Id. Figueroa was told to sit down, wait, and be quiet. Id. While she was waiting, Figueroa saw that Judge Salazar-Napoleoni and Sánchez-Muñoz spoke amongst themselves. Id. at 32. She also observed that the Judge signed some papers. Id.

After a considerable amount of time, Figueroa saw Rivera-Reyes, a marshal in the Caguas courthouse, enter the courtroom. Id. at 33. According to Rivera-Reyes, she went to the courtroom after the marshal's office received a call, informing them that there was a female arrestee in the courtroom, who needed to be taken to the holding cell. Id. Judge Salazar-Napoleoni then ordered a recess, and emptied the courtroom of all other persons except for Figueroa, who was instructed to enter the well of the courtroom. Id. at 34. Therein, Figueroa was told that she was under arrest. Id. Rivera-Reyes then proceeded to take her to the Court marshals' basement office. Id. at 35. She was placed in a holding cell, where she remained for several hours. Id.

While at the holding cell, Figueroa was subjected to a strip search and a visual body search. Id. at 36. Rivera-Reyes instructed her to disrobe. Id. She then performed a visual search of Figueroa's body, and instructed her to assuming a squatting position ("ponerse en cuclillas"). Id. Figueroa was told to cough so as to eject hidden materials from her body. Id. Rivera-Reyes describes the procedure to which Figueroa was subjected, as follows:

**Civil No. 06-1939 (SEC)**                                                                                                 9

> I took the plaintiff to the far corner of the cell and there I told her that I was going to conduct the search..... I asked the plaintiff to remove her blouse. Plaintiff complied and gave me the blouse. I inspected it. Then I asked her to remove her bra. She complied and gave it to me and I inspected it. I observed her torso for bruises and asked her to turn around. I also observed her arms and underarms and the neck. Then I gave her back the bra and the blouse and she put them back on. After that I asked her to remove her pant or skirt (don't remember which one she was wearing). I verified the clothing item. Then I asked her to remove her undergarment and I inspected it. I verified her front and back lower body looking again for bruises, hematomas or lacerations. I never touched the plaintiff.
>
> After the visual inspection I asked her to crouch down three times ("ponerse en cuclillas") and to cough. She complied. After that I told her to dress up.

Id. at 37. According to Rivera-Reyes, Figueroa was submitted to the standard mandatory procedure followed in cases in which there is an order for a person to be admitted to prison. Id. at 38. She states that she was trained in this procedure during her initial training at the "Marshal's Academy." Id. Rivera-Reyes states that, in her eight years as a marshal, that she has done at least 20 or 25 searches of this nature. Id. at 36 & 38.

> She describes that the standard procedure is as follows:
>
> Well, the procedure is that the person is going be disrobed. I don't touch the body at any time. I have on plastic gloves. I touch the person's belongings. I... tell the person, if she has on a skirt, has on a blouse, or has on pants and a blouse, I say: "Take of the upper part first, please...I say: "Please, take off your blouse, take of your brassiere." I receive the blouse, I check out the borders of the waist, of the neck, of the sleeves.... I take the brassiere, and I also examine it. I observe the person's body from the front. If her breasts are droopy, I say "please, lift up your breasts," because there could be ulcers or marks beneath the breasts. I say "turn around." I verify the back area, the arms. I say, "lift your arms to verify the underarms." When I see that all is OK, I say "please, put on your clothes." When she has finished putting on her clothes, I say to her "please, we are now going to have you remove your clothes below the waist." If it is a skirt, if it is pants, she takes them off. I verify the waist and the seems on the sides, the seems on the cuff. She takes off her undergarments. ... I observe her. I say, "turn around."...As part of the procedure which I learned.... you have to say to the person "Put yourself in a squatting position and cough.

Id. at 39.

When asked why the person has to cough three times, while squatting ("en cuclillas"), Rivera-Reyes explained that this is done "for the purpose of expelling anything if the person has hidden things in their intimate parts." Id. at 40. Furthermore, when asked about the

reason for this search, Rivera-Reyes stated that her "greatest responsibility" is "security," explaining that: "...the person who is going to be with us in a cell, or is going to be before the judge, or is going to be with us, we have to be completely sure and convinced that that person does not represent a risk, either for her, for me, for her cell-mates, for the judge, or for the co-workers who come from Vega Alta (prison) to get her, or even for ... my institution." Id. at 41. Rivera-Reyes also stated that "the person has to be apt to be received by the co-workers from Vega Alta ...and [sic] we have to be completely sure that the person does not have on her body a cellular phone, or a shank, or a knife, or anything with which she could cause damage to herself or others." Id. at 42. Rivera-Reyes also states that the strip search conducted in the holding cell is not the only search to which the individual is subjected. Id. at 43. According to Rivera-Reyes, when a person is eventually sent to a penal institution, this standard strip and visual body search procedure is done three times. Id. The first search is done by a court marshal, such as Rivera-Reyes; the second is done when the corrections officers arrive at the holding area, and the third is done once the prisoner arrives at the prison facility. Id.

Rivera-Reyes states that, during her training at the Marshal's Academy, she was not taught about civil rights, and has no idea what "civil rights" are. Id. at 44. Furthermore, she has never heard the term "body cavity search," although she believes that the "standard procedure" does not qualify as a body cavity search — despite the obligation that the person "cough" to remove items from their bodily orifices — because she does not specifically touch the person, or look into these cavities. Id. Rivera-Reyes admits that when she conducted Figueroa's cavity search, she had no information which indicated that Figueroa had any prior arrests. Id. at 45. She also lacked information as to whether Figueroa was a violent person, used illegal drugs, or possessed contraband. Id. Rivera-Reyes knew that all persons — other than certain court personnel and attorneys — have to go through a metal detector when they enter the Caguas courthouse. Id. at 46. Furthermore, she knew that Figueroa's arrest had been

issued by a family court judge. Id. at 47. Rivera-Reyes did not make any effort to ascertain the reasons for the arrest, because she applies the same procedure on searches to all persons, independently of the reasons for which they are being arrested. Id. She stated that "at the time of the search, [she does] not verify where the arrest is from, because ... [she] was taught that ... the same procedure applies to all persons." Id.

Rivera-Reyes admits that, in many cases involving family matters, persons who are initially arrested, are released before actually being turned over to a penal institution, since family members come forward, and the judges lift the order requiring internment in a correctional facility. Id. at 48. She further admits that she does not know about any case in which a person arrested on orders of a family court judge was interned in a penal institution, or a case in which she or her co-workers have found a knife, weapon, shank, or other such contraband. Id. at 49.

During the time that Figueroa was in the Marshal's basement office, most of which was spent in the holding cell, she had no physical contact with any other person. Id. at 50. Her only contact was with one other prisoner, also arrested in connection with a family matter. Id. No one was allowed to visit her in the cell. Id. After spending several hours in the holding cell, Figueroa was returned twice to the courtroom during the afternoon session. Id. at 51. She was taken, by Rivera-Reyes, to the courtroom where her former daughter-in-law, and Sánchez-Muñoz were present. Id. Eventually, López appeared, and argued on her behalf, after which the court vacated the contempt citation, and Figueroa was allowed to return home. Id. at 52. Plaintiff was never incarcerated in a penal institution on the contempt charge. Id. As of September 10, 2007, Figueroa adopted L.E.V. Id. at 5.

Plaintiff avers that, based on the foregoing facts, this Court should enter summary judgment in her favor. In determining whether to grant Plaintiff's request, this Court must first examine the current case law regarding strip and cavity searches.

In recent years, ample case law has developed dealing with "the routine practice in

many jails of strip searching arrestees not yet convicted of any crime." Tardiff v. Knox County, 365 F.3d 1, 2 (1st Cir. 2004). Those who are improperly searched have brought suit under the Fourth Amendment against the officials and government entities who conducted the search. Id. Although the qualified immunity defense has defeated some of these claims, when the official is sued in its individual capacity, said defense lacks merit. See Id.

The First Circuit has repeatedly recognized that visual body cavity searches are a "'severe if not gross interference with a person's privacy'", and "'impinge seriously upon' Fourth Amendment values." Roberts v. Rhode Island, 239 F.3d 107, 110 (1st Cir. 2001) (citing Bell v. Wolfish, 441 U.S. 520, 559 (1979)); see also Swain v. Spinney, 117 F.3d 1, 7 (1st Cir. 1997). In determining whether a strip and visual body cavity search violates the fourth Amendment in a detention setting, this Circuit adopted the Supreme Court's holding in Bell v. Wolfish. Tardiff v. Knox County, 573 F. Supp. 2d 301, 304 (1st Cir. 2008). Therein the Supreme Court held that the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. (citing Bell, 441 U.S. at 559). Therefore, after Bell, the First Circuit has consistently held that "strip and/or visual body cavity searches are not routine, and must be carefully evaluated." Swain, 117 F.3d at 7.

In Tardiff, the First Circuit held that reasonable strip searches in detention facilities are constitutional insofar as these facilities are generally fraught with serious security dangers, like smuggling of money, drugs, weapons, and other contraband, and it is commonplace for inmates to attempt to transport these items into the facility by concealing them in body cavities. Id.; Roberts, 239 F.3d at 112. In this context, the government's interest in the institution's security is compelling enough to allow warrantless strip searches,

**Civil No. 06-1939 (SEC)**                                                                                                    13

even absent reasonable suspicion of individual wrongdoing. Roberts, 239 F.3d at 111; Bell, 441 U.S. at 559. Pursuant to Bell, the First Circuit has also upheld as constitutional a prison's blanket policy of strip searching inmates after contact visits, however, the court notes that said policy responds to the particular risk posed by contact visits, that is, smuggling of drugs, weapons, and contraband. Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 68 (1st Cir. 2003). Therefore, despite allowing generalized strip searches in said contexts, there are other instances in which the "lawfulness of a strip search depends on whether the circumstances reasonably justify such an intrusive invasion of privacy." United States v. Cofield, 391 F.3d 334, 336 (1st Cir. 2004).

According to this Circuit, distinct from strip searches in correctional facilities, in the context of prisoners held in local jails for minor offenses, the officers "must have a 'reasonable suspicion' that an arrestee is concealing contraband or weapons before they can conduct a strip and visual body cavity search of that arrestee....'" Tardiff, 573 F. Supp.2d at 304; see also Roberts, 239 F.3d at 109 (citing Bell, 441 U.S. at 545); Swain, 117 F.3d at 7. This extends to both felonies and misdemeanors, insofar as the appellate court has also noted that "felony categorization alone does not obviate the requirement of individualized reasonable suspicion for a strip and visual body cavity search of an arrestee," since distinguishing between felony and misdemeanor charges provides little information as to whether the arrestee is concealing weapons or contraband. Tardiff, 573 F.Sup.2d at 306.  In Swain, the strip search of an arrestee who was held in a local prison, and who had no contact with other prisoners, was held unconstitutional. 117 F.3d at 8. Moreover, in Wood v. Hancock County, 354 F.3d 57, 62 (1st Cir. 2003), the First Circuit held that "an individual detained on a misdemeanor charge may be strip searched as part of the booking process only if officers have reasonable suspicion As such, security concerns alone do not support an indiscriminate strip search policy applied to those detained for minor offenses in local jails." Roberts, 239 F.3d at 113. That type of policy has been found unconstitutional under the

**Civil No. 06-1939 (SEC)**                                                                                          14

Fourth Amendment. Id.

Considering the above mentioned uncontested facts, this Court finds that Rivera-Reyes is personally liable to Figueroa. First Circuit case law unequivocally holds that visual body cavity searches are not routine, since they entail an intrusive invasion of a person's privacy. As a result, a generalized practice or blanket policy of conducting cavity searches of every arrestee is only allowed when institutional security reasons justify such an intrusion, particularly when there is a known history of money, drugs, weapons, and other items being smuggled in by arrestees and visitors. In the present case, none of the before mentioned elements were present. There is clear and convincing evidence that Rivera-Reyes submitted Figueroa to a full body cavity search despite knowing that her arrest was for civil contempt, that she was not accused of any violent crime or drug possession, that she had no previous criminal history, that she remained by herself at all times in the holding cell, that she was not suspected of smuggling contraband, that she had passed through the Court's entrance metal detectors, and that contempt charges in family court cases are usually dropped, prior to the person being taken to prison. She further admits that she did not make any effort to ascertain the reasons for the arrest despite the aforementioned circumstances. Therefore, despite the fact that Figueroa did not present a security risk to Rivera-Reyes, the court, or the correctional institution, she was forced to submit herself to a cavity search due exclusively to the fact that she was arrested.

As such, Rivera-Reyes, as an experienced marshal, should have known that her conduct was unreasonable and illegal. Albeit "law enforcement official's reasonable, although mistaken, conclusion regarding the presence of 'exigent circumstances' supporting a warrantless search does not subject that official to personal liability," that is not the case at hand. Cookish v. Powell, 945 F.2d 441, 449 (1st Cir. 1991) (citing Anderson v. Creighton, 483 U.S. 635, 641 1987). As previously stated, there were no exigent circumstances, specifically a security threat, which warranted Rivera-Reyes actions. In fact, Rivera-Reyes

**Civil No. 06-1939(SEC)**                                                                                          15
_____

admits that the sole reason for a cavity search is to ensure the courts, the correctional institution, and its officers' security, and she had no reason to believe that Figueroa was armed, dangerous, used drugs, or was smuggling contraband. Based on the foregoing, this Court concludes that Rivera-Reyes' illegal conduct is blatant, insofar as there was no compelling reason for the cavity search, as she had no individualized reasonable suspicion that Figueroa was hiding weapons, drugs, or other contraband. As a result, Rivera-Reyes is personally liable for Plaintiff's damages.

### Conclusion

For the reasons stated above, Plaintiff's motion for partial summary judgment is **GRANTED**. A hearing on damages will be scheduled shortly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2009.

*S/Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge